1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **MARY ELIZABETH C.,**[1] | ) | NO. CV 19-3723-KS |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| **ANDREW M. SAUL,**[2] **Commissioner** | ) | |
| **of Social Security,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## INTRODUCTION

Mary Elizabeth C. ("Plaintiff") filed a Complaint on May 1, 2019, seeking review of the denial of her application for Supplemental Security Insurance ("SSI"). (Dkt. No. 1.)  On May 31, 2019, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge.  (Dkt. Nos. 11-13.)  On March 26, 2020, the parties filed an Amended Joint Stipulation ("Joint Stip.").[3]  (Dkt. No. 28.)  Plaintiff seeks an

---

[1]    Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2]    The Court notes that Andrew M. Saul is now the Commissioner of the Social Security Administration. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court orders that the caption be amended to substitute Andrew M. Saul for Nancy A. Berryhill as the defendant in this action.

[3]    The parties filed the Joint Stipulation on March 19, 2020, but it was not signed by defense counsel. (*See* Dkt. No. 25-26.)  Accordingly, the parties were ordered to file an amended Joint Stipulation correcting the error. (Dkt. Nos. 27.) The two versions of the Joint Stipulation are substantively identical.

order reversing and remanding for further administrative proceedings. (Joint Stip. at 41-42.) The Commissioner requests that the ALJ's decision be affirmed. (*Id.* at 42.) The Court has taken the matter under submission without oral argument.

## SUMMARY OF PRIOR PROCEEDINGS

On November 24, 2014, Plaintiff, who was born June 21, 1968, filed an application for SSI.[4] (*See* Administrative Record ("AR") 185-94.) Plaintiff alleged disability commencing July 27, 2013 due to bipolar disorder, schizophrenia, panic attacks, diabetes, asthma, obesity, sleep apnea, foot pain, and migraines. (AR 88-89, 185.) She previously worked as a teacher's aide (DOT[5] 249.367-074) and an amusement park worker (DOT 349.664-010). (AR 22.) After the Commissioner initially denied Plaintiff's application and reconsideration (AR 88-99, 101-15), she requested a hearing (AR 141-43). Administrative Law Judge Loranzo Fleming (the "ALJ") held a hearing on October 16, 2017. (AR 29.) Plaintiff and a vocational expert testified. (AR 36-86.) On March 22, 2018, the ALJ issued an unfavorable decision. (AR 15-24.) On February 26, 2019, the Appeals Council denied Plaintiff's review. (AR 1-3.)

## SUMMARY OF ADMINISTRATIVE DECISION

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the date she applied for SSI. (AR 17.) He determined that Plaintiff had the following severe impairments: obesity, diabetes, asthma, schizoaffective disorder, and panic disorder with agoraphobia. (*Id.*) After specifically considering listings 3.03, 12.04, and 12.06, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. part 404, subpart P,

---

[4]     Plaintiff was 45 years old on the alleged onset date, and 46 on the date of the SSI application; she thus met the agency's definition of a "younger person." *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).

[5]         "DOT" refers to the *Dictionary of Occupational Titles*.

2

appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926).  (AR 17-18.)  He determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work, with the following limitations:  "no more than frequently climbing ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; must avoid environmental irritants, dangerous machinery, and working at heights; capable of performing simple routine tasks; making simple work related decisions; no more than occasionally interacting and responding appropriately with supervisors, coworkers, and the public; and can tolerate few changes in a routine work setting."  (AR 18.)

The ALJ found that Plaintiff could not perform her past relevant work.  (AR 22.)  He determined that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant number in the national economy that Plaintiff could perform, including the jobs of laborer (DOT 922.687-058); cleaner, lab equipment (DOT 381.687-022); conveyor feeder (DOT 921.686-014); addresser (DOT 209.587-010); stuffer (DOT 731.685-014); and table worker (DOT 739.687-182).  (AR 22-23.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, since the date she filed for benefits.  (AR 23.)

## STANDARD OF REVIEW

This Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (citation omitted).  "Even when the evidence is susceptible to more than one rational interpretation, [the Court] must uphold the ALJ's findings if they are

supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in her decision "and may not affirm the ALJ on a ground upon which [s]he did not rely." *Orn*, 495 F.3d at 630. The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error, 'the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (citations omitted).

## DISCUSSION

Plaintiff raises four issues: whether the ALJ (1) properly evaluated the opinion evidence; (2) properly evaluated Plaintiff's subjective statements; (3) properly evaluated lay witness statements; and (4) erred in determining Plaintiff's RFC. (Joint Stip. at 3.) For the reasons discussed below, the Court concludes that remand is warranted because the ALJ erred in his evaluation of two of Plaintiff's physicians and by formulating an RFC that failed to properly account for Plaintiff's obesity.

//

//

//

4

## I. The ALJ's Evaluation of Plaintiff's Treating Physicians

### A. Legal Standard

"The ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015). In doing so, the ALJ must articulate a "substantive basis" for rejecting a medical opinion or crediting one medical opinion over another. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). "Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13; *see also Marsh v. Colvin*, 792 F.3d 1170, 1172-73 (9th Cir. 2015) ("[A]n ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them."). However, an ALJ's failure to mention a treating source may not warrant remand if the error was harmless. *See Marsh*, 792 F.3d at 1173.

The opinion of a treating source is generally entitled to greater weight than the opinion of a non-treating doctor because a treating source is "most able to provide a detailed, longitudinal picture" of a claimant's medical impairments and bring a perspective to the medical evidence that cannot be obtained from objective medical findings alone. *See Garrison*, 759 F.3d at 1012; 20 C.F.R. § 404.1527(c)(2) (governing claims filed before March 27, 2017). Likewise, the opinions of examining sources are given more weight than non-examining source opinions. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). To reject an uncontradicted opinion of a treating or examining source, the ALJ must provide "clear and convincing reasons that are supported by substantial evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017). The ALJ need not accept a treating source's opinion if it is "brief,

conclusory, and inadequately supported by clinical findings" or "by the record as a whole." *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Alternatively, "[i]f a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Trevizo*, 871 F.3d at 675. "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings." *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

## B.  Plaintiff's Physical Impairments

### i.  The Opinion Evidence

In April 2015, Plaintiff's record was evaluated by state agency consultant, A. Dipsia, M.D., in connection with her initial disability determination. (AR 91-96.) He reviewed Plaintiff's records between November 2013 and March 2015, and noted there was no opinion evidence predating his opinion. (AR 91-92, 95.) He found that Plaintiff had extreme obesity with a body mass index ("BMI") of 50-59.9, asthma, and diabetic neuropathy. (AR 92.) He assessed that Plaintiff's medically determinable impairments could reasonably be expected to produce Plaintiff's symptoms, but that her statements about the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated by the objective evidence alone. (AR 94.) Dr. Dipsia found Plaintiff partially credible as to her allegations and the severity of her symptoms. (AR 95.) He assessed the following RFC:  she could lift and/or carry 20 pounds occasionally, and 10 pounds frequently; she could stand, walk, and sit for 6 hours in an 8-hour workday; she had no limitations in pushing or pulling; because of her extreme obesity, she had postural limitations, *i.e.*, she could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; she could never climb ladders/ropes/scaffolds; she had no manipulative, visual, communicative, or environmental limitations; she had to avoid

concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; and she could tolerate extreme cold and heat, wetness, humidity, noise, vibrations, and hazards.  (AR 95-96.)

In September 2015, Plaintiff's record was evaluated by state agency consultant, S. Clancey, M.D., in connection with her disability determination on reconsideration.  (AR 109-11.)  He found that because of her morbid obesity and foot pain, Plaintiff had the following exertional limitations:  she could lift and/or carry 20 pounds occasionally and 10 pounds frequently; she could stand and/or walk with normal breaks for 2 hours and sit for 2 hours in a normal workday; and she had no other restriction in her ability to lift and/or carry.  (AR 109-10.)  Due to extreme obesity, Plaintiff had the following postural limitations:  she could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and she could never climb ladders/ropes/scaffolds.  (AR 110.)  Plaintiff had no manipulative, visual, or communicative limitations.  (*Id.*)  She also had environmental limitations due to her asthma and obesity:  she had to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards; but she could tolerate extreme cold and heat, wetness, humidity, noise, and vibration.  (AR 110-11.)  Dr. Clancey concluded by partially adopting Dr. Dipsia's April 2015 determination, but finding that due to Plaintiff's "massive morbid obesity (BMI over 50)," a limitation to sedentary work with additional limits was appropriate and consistent with Plaintiff's medical history.  (AR 111.)

In August 2017, Plaintiff was evaluated by internal medicine consultative examiner, Sohail Afra, M.D.  (AR 477-83.)  He did not review Plaintiff's prior records, but Plaintiff described her medical history to him, which he summarized in his report.  (AR 477-79.)  His physical examination showed that Plaintiff with morbidly obese with a BMI of 35.8, but findings were in the normal range in her head, neck, chest, cardiovascular system, abdomen, extremities, and in her musculoskeletal and neurological regions.  (AR 479-81.)  Plaintiff had mild reproducible pain but with full range of motion in her ankle joints and feet, and she could walk without difficulty.  (AR 481-82.)  Based on the foregoing, Dr. Afra assessed the

following functional limitations:  she could push, pull, lift, and carry 50 pounds occasionally and 25 pounds frequently; walk and stand 6 hours out of an 8-hour day; sit without restrictions; bend, kneel, stoop, crawl, and crouch frequently; walk on uneven terrain, climb ladders, and work with heights frequently; and hear and see without restrictions.  (AR 482-83.)

Dr. Afra also completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical) (AR 484-89).  He assessed as follows.  Plaintiff could lift and carry 11 to 20 pounds frequently and 21 to 50 pounds occasionally.  (AR 484.)  Without interruption, she could sit for 2 hours, stand for 45 minutes, and walk for 45 minutes; and over the course of an 8-hour workday, she could sit for 8 hours, and stand and walk for 6 hours.  (AR 485.)  She could continuously reach, handle, finger, feel, push, and pull with both hands.  (AR 486.)  She could operate foot controls continuously with her right foot, and frequently with her left foot.  (*Id.*)  She could frequently climb stairs and ramps, climb ladders and scaffolds, balance, stoop, kneel, crouch, and crawl.  (AR 487.)  She could tolerate exposure to vibrations continuously; to unprotected heights, moving mechanical parts, and operating a motor vehicle frequently; and to dust, odor, fumes, pulmonary irritants, extreme cold, and extreme heat occasionally.  (AR 488.)  She could shop, travel without assistance, ambulate without an assistive device, walk a block at a reasonable pace on uneven surfaces, use public transportation, climb a few steps at a reasonable pace with use of a single handrail, prepare a simple meal and feed herself, care for her personal hygiene, and sort/hand/use paper and files.  (AR 489.)

### ii.  Analysis

In his decision, the ALJ noted that Dr. Dipsia had opined that Plaintiff could perform a limited range of light work, but was limited to standing and/or walking two hours out of an eight-hour workday.  (AR 21 (citing initial disability determination).)  He then gave "greater weight" to the Dr. Afra's opinion, reasoning that he had the opportunity to examine Plaintiff

in the clinical context and his findings provided a greater longitudinal perspective of the medical record.  (*Id.*)  The ALJ did not discuss Dr. Clancey's opinion.

Plaintiff contends that the ALJ erred in evaluating opinion evidence of Plaintiff's physical impairments.[6]  First, despite giving great weight to Dr. Afra's opinion, the ALJ erred by ignoring portions of his opinion showing that Plaintiff had greater limitations.  (Joint Stip. at 4, 12-13.)  Second, Plaintiff argues, the ALJ did not explain why he was rejecting Dr. Dipsia's opinion.  (*Id*. at 4.)  Third, Plaintiff argues that the ALJ did not address the RFC for sedentary work opined by Dr. Clancey and did not provide a reason for apparently rejecting this opinion.  (*Id*. at 4, 13.)

### 1.  Dr. Afra

The ALJ did not err in evaluating Dr. Afra's opinion.  The regulations provide that a treating physician's assessment should be given more weight than that of other physicians' opinions "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)[.]"  20 C.F.R. § 404.1527(c)(2).  The record contains no opinion evidence about Plaintiff's physical impairments from a treating physician.  Thus, Dr. Afra's opinion, *i.e.*, the opinion of an examining physician, sits highest in the hierarchy of opinion evidence in this case.  *See Garrison*, 759 F.3d at 1012 (holding that treating physicians are at the top of the hierarchy of medical opinion evidence, *i.e.*, opinions from treating, examining, and non-examining physicians).  An examining physician's assessment, while less likely to provide a comprehensive picture of a claimant's condition than a treating physician, is *more* likely to provide such a picture than a non-examining physician's

---

[6]        Plaintiff also contends that the ALJ erred by failing to discuss the impact of Plaintiff's obesity on her functionality.  (Joint Stip. at 12-13.)  However, this argument does not pertain to the ALJ's evaluation of the opinion evidence and Plaintiff substantively repeats the argument in the fourth issue she raises, whether the ALJ's RFC assessment is supported by substantial evidence.  (*See id.* at 36-39.)  Thus, the Court will address Plaintiff's argument concerning the evaluation of her obesity during its discussion of the fourth issue raised by Plaintiff, *infra*.

assessment.  The ALJ found that Dr. Afra was best equipped to provide a longitudinal view of Plaintiff's condition over time and the Court agrees.  This reason is also supported by substantial evidence; although Dr. Afra did not review Plaintiff's medical record, she thoroughly described her medical history to him, which he summarized in his evaluation.  (AR 477-79.)  Based on his ability to compare Plaintiff's medical history to his own examination findings, Dr. Afra was well-positioned to evaluate Plaintiff's condition, properly accounting for the evolution of her impairments.

Plaintiff's argument that that the ALJ failed to consider more restrictive limitations in Dr. Afra's opinion is without merit.  Plaintiff takes issue with Dr. Afra's opinion that Plaintiff was limited to standing and walking each for 45 minutes at a time, and sitting for 2 hours at a time; but the regulations do not require that, to perform medium work, a claimant be able to stand and walk continuously for more than 45 minutes, or sit continuously for more than two hours.  They simply state that medium work involves "standing or walking, *off and on*, for a total of 6 hours in an 8-hour workday" with "sitting [that] may occur *intermittently* during the remaining time."  Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *6 (S.S.A. 1983) (emphasis added).  All aspects of Dr. Afra's opinion comport with this definition.  He did not state that Plaintiff would need to take breaks of any duration or change from standing/walking to sitting, or vice versa, after doing one activity for a significant period of time.  Thus, the ALJ did not err in his evaluation of Dr. Afra's opinion and remand on this basis is not warranted.

### 2.  Dr. Dipsia

Plaintiff contends that the ALJ erred in his evaluation of Dr. Dipsia's opinion because he gave no weight to that opinion.  (Joint Stip. at 4.)  Although the ALJ did not explicitly give any weight to Dr. Dipsia's opinion, that omission is not necessarily fatal where the import of the opinion to the ALJ can be discerned by his decision.  *See Dixon v. Saul*, 411 F. Supp. 3d 837, 848 n.3 (N.D. Cal. 2019) ("The ALJ did not specifically assign weight to [the doctor's]

medical opinion, though his heavy reliance on that opinion suggests great weight was assigned it."). The ALJ did not ignore Dr. Dipsia's opinion. Instead, he described it and immediately thereafter discussed and gave "greater weight" to Dr. Afra's opinion. (AR 21.) Thus, it is apparent that Dr. Dipsia's opinion was given less weight than the opinion of Dr. Afra. As discussed, standing alone, Dr. Afra's ability to provide a longitudinal view of Plaintiff's condition was a legitimate basis for crediting that decision. And viewing Dr. Afra's opinion in the context of the ALJ's discussion of the relationship between Drs. Afra's and Dipsia's opinions, the ALJ's stated reason was also a legitimate basis to credit Dr. Afra's opinion *over* Dr. Dipsia's. *Cf. Garrison*, 759 F.3d at 1012-13 (holding that an ALJ errs where he "does not . . . set forth specific, legitimate reasons for crediting one medical opinion over another" or when he simply "ignor[es the opinion], asserting without explanation that another medical opinion is more persuasive"). Moreover, this reason is supported by substantial evidence because Dr. Dipsia reviewed Plaintiff's case only a few months after the alleged onset date and more than two years before Dr. Afra; he did not consider any medical records after March 2015; and he never examined Plaintiff. In sum, Dr. Afra had a better sense of Plaintiff's condition over time and could formulate an opinion in line with that longitudinal view. Thus, the Court finds no legal error in the ALJ's implicit assessment of Dr. Dipsia's opinion.

### 3. Dr. Clancey

Turning to the opinion of Dr. Clancey, Plaintiff contends that the ALJ did not address the RFC for sedentary work assessed by Dr. Clancey or explain why he was rejecting this opinion. (Joint Stip. at 4, 13.) Plaintiff is correct. The ALJ's decision does not mention Dr. Clancey's opinion that Plaintiff could perform only sedentary work. Accordingly, the ALJ erred by completely ignoring Dr. Clancey's opinion. *See Garrison*, 759 F.3d at 1012-13; *Marsh*, 792 F.3d at 1172-73. The ALJ's error is not harmless because it cannot be said that "no reasonable ALJ, when fully crediting [Dr. Clancey's opinion], could have reached a different disability determination." *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1056 (9th

Cir. 2006).   The question here is whether any reasonable ALJ, having considered Dr. Clancey's opinion, could have limited Plaintiff to sedentary work.  "If so, then the error cannot be considered harmless and must be corrected by the agency."  *Raymond v. Comm'r of Soc. Sec.*, 2014 WL 5797346, at *4 (E.D. Cal. Nov. 6, 2014).  The Court must answer this question in the affirmative.

Dr. Clancey found that Plaintiff should be limited to sedentary work because she was morbidly obese, with a BMI of 50+.  (AR 111.)  It is reasonable that an ALJ, having considered opinion evidence discussing the impact of Plaintiff's obesity on her RFC, could have limited Plaintiff to sedentary work.  *See, e.g.*, *Barnes v. Berryhill*, 895 F.3d 702, 703-04 (9th Cir. 2018) (noting that ALJ found morbid obesity to be severe impairment and assessed RFC limiting plaintiff to sedentary work with restrictions); *Wedge v. Astrue*, 624 F. Supp. 2d 1127, 1132 (C.D. Cal. 2008) (stating that plaintiff's treating physician limited plaintiff to sedentary-to-light work due to his scoliosis and obesity); *Hubbard v. Astrue*, 2009 WL 723027, at *6 (W.D. Wash. Mar. 16, 2009) (affirming ALJ's evaluation of medical evidence based, in part, on two doctors' opinions limiting plaintiff to sedentary work in part due to obesity). Accordingly, the ALJ's failure to properly consider Dr. Clancey's opinion potentially undermines the ALJ's RFC determination.  Remand for reconsideration of this opinion is warranted.

### C. Plaintiff's Mental Impairments

#### i. The Opinion Evidence

In April 2015, Kevin Gregg, M.D. reviewed Plaintiff's mental impairments in connection with the initial disability determination.  (AR 93-94.)  He found that Plaintiff had: medically determinable impairments in the form of affective disorders; no restriction in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties

in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (AR 93.) He noted that Plaintiff's only prescriptions were Celexa and Zoloft for mild depression, which was inconsistent with her allegations of bipolar disorder and schizophrenia and there was no other objective evidence of those conditions. (AR 94.) He concluded that Plaintiff did not have a severe psychiatric impairment. (*Id.*)

In October 2015, Philip Kanof, M.D., a board certified psychiatrist, evaluated Plaintiff. (AR 469-72.) No medical records were available for his review. (AR 470.) Dr. Kanof observed that Plaintiff "appeared to be a reliable though somewhat histrionic historian." (AR 469.) He discussed her psychiatric medical history, as relayed to him by her, including that she suffered from mood swings resulting from a diagnosis on the bipolar spectrum; she experienced weeks-long "highs" during which she had elevated moods, could not concentrate, spoke rapidly, and barely slept; followed by months-long "lows," characterized by depressed mood, and persistent tiredness. (*Id.*) She endorsed having psychotic symptoms present even during periods between mood swings, including visual and auditory hallucinations. (AR 469-70.) At the time of the evaluation, Plaintiff described experiencing extreme anxiety around people, sometimes resulting in panic attacks precluding her from working. (AR 470.) Her psychotropic medication included Iloperidone, Sertraline, and Trazodone; and she had previously taken other medications for mood stabilization, including lithium and valproic acid. (*Id.*) In 1992, she was hospitalized for suicidal ideation, and had four prior suicide attempts, most recently in 2003. (*Id.*) She stated she could dress and bathe herself, but spent most of the day inside where she felt "safe." (AR 471.) She took care of her service dog, read, watched television, shopped and cooked, paid her own bills, engaged in conversation with her roommates, and spent time with her grandchildren. (*Id.*)

Plaintiff's mental status examination revealed as follows. She was cooperative and maintained good eye contact; she was alert and fully conscious, as well as oriented to person and date; her mood appeared moderately anxious, but she displayed a fair range of affect; and

she experienced visual hallucinations much of the time and auditory hallucinations several times a day, with voices telling her to commit suicide. (*Id.*) Her thoughts appeared to concern her daily activities and her difficulties with anxiety associated with being around others; there was no evidence of delusional thinking; her thought processes were linear; and her insight and judgment were fair. (*Id.*) Dr. Kanof diagnosed Plaintiff with, *inter alia*, panic disorder with agoraphobia. (AR 472.) He assessed that she suffered from cyclic mood disturbance, characterized by periods of hypomania and sustained depression on the bipolar spectrum. (*Id.*) Her mood swings were somewhat stabilized by her medication, but she had persistent psychotic symptoms occurring outside the context of her mood syndrome, likely deriving from a schizoaffective disorder. (*Id.*) Most of her psychiatric disability came from a concurrent diagnosis of panic disorder with agoraphobia, limiting her ability to interact with others. (*Id.*) Her ability to understand, remember, and perform instructions was not impaired; to maintain focus and concentration was mildly impaired; to comply with job rules, such as safety and attendance, was moderately impaired; and to respond to work pressure in a usual work setting, and to interact with the public, coworkers, and supervisors were severely impaired. (*Id.*) Dr. Kanof concluded that Plaintiff's schizoaffective disorder was reasonably well-controlled, but she had marked symptoms of a panic disorder with agoraphobia. (*Id.*) He opined that given Plaintiff's mood disorder with psychotic symptoms and it was likely that she would remain functionally impaired for the foreseeable future. (*Id.*)

In November 2015, Plaintiff's file was reviewed by Alan L. Berkowitz, M.D. in connection with her disability determination on reconsideration. (AR 111-13.) He concluded that she had no limitation in understanding or memory. (AR 111.) He then found that she had some limitation in concentration and persistence, including a moderate limitation in maintaining attention and concentration. (AR 112.) But he found no significant limitation in her ability to carry out short and simple as well as detailed instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in

proximity to others without being distracted by them; to make simple work-related decisions; and to complete a normal workday and week without interruptions from psychological symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*)  Dr. Berkowitz explained that Plaintiff had a significant mood disorder that mildly limited her ability to tolerate work pressure and to maintain concentration throughout the workday and week.  (*Id.*)  He then found that Plaintiff had limitations in social interaction due to her panic disorder with agoraphobia—specifically, a moderate limitation in her ability to appropriately interact with the general public; but no significant limitation in her ability to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, or to maintain socially appropriate behavior and to adhere to basic standards to basic standards of neatness and cleanliness.  (*Id.*)  Dr. Berkowitz concluded that despite Plaintiff's allegations of worsening symptoms, her examination revealed only mild impact on concentration and she was capable of non-public work.  (AR 113.)

## ii.   The ALJ's Decision

The ALJ gave little weight to Dr. Kanof's opinion.  (*Id.*)  He reasoned that Dr. Kanof had not reviewed Plaintiff's mental health records, and it was reasonable to conclude that his assessment was based solely on Plaintiff's one-time presentation and subjective symptoms.  (*Id.*)  The ALJ further reasoned that Plaintiff's treatment records post-dating Dr. Kanof's assessment showed that her symptoms were controlled with medication without side effects.  (*Id.*)  The ALJ then found that Dr. Berkowitz's "findings are generally consistent with the available medical record"; however, the ALJ gave Plaintiff "the benefit of doubt that she has moderate limitations related to concentration, persistence, and pace as well."  (AR 21-22.)

//

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*iii.  Analysis*

*1.  Dr. Kanof*

The ALJ erred in his evaluation of Dr. Kanof's opinion.  He gave three reasons for discounting Dr. Kanof's opinion:  (1) he did not review Plaintiff's medical records; (2) his evaluation was based on a single examination of Plaintiff and her subjective statements; and (3) the record following Dr. Kanof's evaluation showed that Plaintiff's condition was well-managed with medication.  As detailed below, these reasons are not legally sufficient and remand for reevaluation of Dr. Kanof's opinion is warranted.

*a.  Failure to Review Record*

As to the ALJ's first reason—that Dr. Kanof failed to review Plaintiff's medical records—the Agency does not cite, and the Court is not aware of, any authority holding that an examining physician's failure to review the existing medical record or to supplement his own examination and observations with additional records is, alone, a specific and legitimate reason to assign less weight to the opinion.  *See Tania R. v. Comm'r of Soc. Sec.*, 2020 WL 1969989, at *7 (W.D. Wash. Apr. 24, 2020).  Accordingly, the Court finds that, absent additional specific and legitimate reasons provided by the ALJ for discounting Dr. Kanof's opinion, the Court cannot uphold the ALJ's decision as to that opinion.

*b.  Opinion Based on One Examination and Subjective Statements*

As to the ALJ's second reason, his evaluation of Dr. Kanof's opinion cannot be upheld on the basis that the opinion was based on a single examination.  By definition, an examining doctor such as Dr. Kanof does not have a treating relationship with a claimant and usually only examines the claimant once.  20 C.F.R. § 404.1527.  "When considering an examining

16

physician's opinion . . . it is the quality, not the quantity of the examination that is important. Discrediting an opinion because the examining doctor only saw [Plaintiff] one time would effectively discredit most, if not all, examining doctor opinions." *Yeakey v. Colvin*, 2014 WL 3767410, at \*6 (W.D. Wash. July 31, 2014). Therefore, the ALJ improperly discounted Dr. Kanof's opinion on the basis that his evaluation was based on a single examination.

Likewise, the fact that Dr. Kanof's opinion was based on Plaintiff's subjective complaints is not a legitimate reason to discount his opinion. An ALJ may reject a physician's opinion "if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (quoting *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999)). This situation is distinguishable from one in which the doctor provides his own observations in support of his assessments and opinions. *See Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008). "[W]hen an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (citing *Ryan*).

Here, the ALJ has not explained how Dr. Kanof's opinion is based "to a large extent" on Plaintiff's subjective complaints. Although Dr. Kanof noted that Plaintiff was a reliable historian (AR 469), he performed a comprehensive mental status examination and assessed findings consistent with Plaintiff's behavior (AR 471-72). Thus, his opinion appears to be based largely on his own examination findings. Additionally, the Ninth Circuit has noted that "[p]sychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields." *Buck v. Berryhill*, 869 F.3d 1040, 1049. "Diagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient. But such is the nature of psychiatry. Thus, the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness." *Id.*

(internal citations omitted).  Therefore, the ALJ's second reason for discounting Dr. Kanof's opinion is not specific and legitimate, or supported by substantial evidence.

### c.  *Plaintiff's Condition Managed with Medication*

The ALJ's final reason for assigning little weight to Dr. Kanof's opinion was that record evidence post-dating that opinion, *i.e.*, after October 2015, shows that Plaintiff's condition was well-managed with medication without side effects.  (AR 21.)  Plaintiff argues that the record evidence of her treatment for mental impairments does not support the conclusion that her symptoms were adequately controlled with medication; she further contends that Dr. Kanof's opinion was consistent with and supported by records from Plaintiff's treating psychiatrist.  (Joint Stip. at 5, 8, 20; *see id.* at 6-8 (summarizing treating psychiatrist records).)

The record shows that in May 2013, Plaintiff presented to psychiatrist George Sabounjian, M.D. with a long history of bipolar disorder and present symptoms of months-long depression, including feelings of hopelessness, tearfulness, and anxiety; tiredness; paranoia; and decreased focus and concentration.  (AR 337.)  She took, *inter alia*, Celexa and Abilify "on and off," which somewhat helped, especially when very stressed.  (AR 338.)  Based on a mental status examination, Dr. Sabounjian diagnosed Plaintiff with bipolar I disorder, with a recent episode of depression with psychotic features.  (AR 341.)  In January and May 2014, Dr. Sabounjian noted that Plaintiff was taking Celexa and Fanapt; medication adherence resulted in improvement and control of symptoms, with mild physical side effects.  (AR 344-46.)  However, in September 2014, Plaintiff presented with panic attacks and agoraphobia, which prevented her from leaving the house.  (AR 343.)  She reported that Celexa was not helping, but Fanapt seemed to help with paranoia and auditory hallucinations.  (*Id.*)  Dr. Sabounjian noted good adherence to medications, but her mental status was anxious, tense, apprehensive, and a bit paranoid.  (*Id.*)  He prescribed Plaintiff Zoloft, took her off Celexa, and maintained the Fanapt.  (*Id.*)

18

In December 2014, Plaintiff reported some relief with Zoloft for anxiety and panic; but because she ran out of Fanapt, she experienced paranoia, avoidant behavior, feelings of withdrawal, and poor sleep. (AR 342.) Dr. Sabounjian noted good medication adherence and her mental status was anxious and guarded. (*Id.*) In March 2015, Plaintiff's condition was stable on Fanapt, but because she had difficulty obtaining it, she still experienced some auditory hallucinations. (AR 446.) Dr. Sabounjian noted that Plaintiff's medication adherence was good, but her mental status included delusions and hallucinations. (*Id.*) He switched Plaintiff from Fanapt to Invega. (*Id.*) One week later, Plaintiff presented with paranoia, hallucinations, poor sleep, and nightmares. (AR 444.) Dr. Sabounjian found good medication adherence and her mental status was anxious, tense, and hypervigilant; he increased her dosage of Invega. (*Id.*) In April 2015, Plaintiff resumed Fanapt, which caused subsiding hallucinations and nightmares, but she still struggled with sleep. (AR 442.) Dr. Sabounjian noted good medication adherence, but her mental status was anxious with some paranoia. (*Id.*) He increased her Fanapt dosage. (*Id.*) In July 2015, three weeks after witnessing a traumatic event, Plaintiff experienced exacerbating symptoms, including anxiety, fearfulness, terror, hypervigilance, avoidance, and lack of sleep. (AR 441.) Dr. Sabounjian noted that she was socially isolative and could not appropriately function in public. (*Id.*) Her adherence to medication was good; Dr. Sabounjian prescribed Trazodone, an antidepressant. (*Id.*)

In October 2015, the month of Dr. Kanof's evaluation, Plaintiff reported that she stopped taking Fanapt for a few days because she was ill; consequently, she experienced intensified fear, paranoia, and anxiety. (AR 490.) Once she resumed her medication, her symptoms subsided, but she mostly stayed home and only left the house with her service dog. (*Id.*) Dr. Sabounjian noted that her medication adherence was good, but her mental status was anxious, tense, and hypervigilant. (*Id.*) He refilled her prescriptions. (*Id.*) In March 2016, Plaintiff noted that because she had run out of Fanapt, her auditory hallucinations returned, she was anxious, irritable, restless, and emotional. (*Id.*) Adherence to medication was fair; her mental status was anxious and tense; and Dr. Sabounjian refilled her medications. (*Id.*) By July 2016,

Plaintiff's adherence to medication was again good, but she reported more anxiety and panic with poor sleep, persistent paranoia, fear, hypervigilance, and occasional hallucinations. (AR 491.) Her mental status was anxious, tense, and paranoid; and Dr. Sabounjian increased her dosages of Zoloft and Trazodone. (*Id.*) In October 2016, despite good medication adherence, Plaintiff still had episodes of fear, anxiety, and "feeling of jumping out of her skins," but her hallucinations were "infrequent." (AR 492.) Her mental status was paranoid, anxious, and tense. (*Id.*) Dr. Sabounjian switched her from Fanapt to Rexulti. (*Id.*) Two weeks later, Plaintiff experienced improvement in her symptoms, including more energy, less paranoia, greater desire to be social when outside, and decreased feeling of being sedated. (AR 493.) Dr. Sabounjian decreased her Zoloft dosage, but increased Rexulti. (*Id.*)

In November 2016, Dr. Sabounjian slightly adjusted Plaintiff's medications and noted that her adherence to medication and mental status were good. (AR 493-94.) In addition to her existing medication regimen, she was prescribed Topamax for weight loss. (AR 494.) In February 2017, Plaintiff's condition remained stable, with no significant adverse symptoms. (*Id.*) However, in May 2017, Plaintiff experienced external stressors and requested an increase in the dosage of her medication. (AR 496.) Dr. Sabounjian noted that her mental status was depressed, sad, and tearful at times; and her adherence to medication was good. (*Id.*) He increased her dosages of Zoloft and Topamax. (*Id.*) In August 2017, Dr. Sabounjian noted that "although [Plaintiff] derive[d] benefits from her med[ication]s, she is increasingly more isolated" due to the life stressors. (AR 498.) He noted that her adherence to medication was good, her mental status was sad and tearful, and he continued her medications. (*Id.*)

Based on the foregoing record evidence, the Court concludes that the record does not support the conclusion that Plaintiff's symptoms were well-managed by medication. In the period following Dr. Kanof's opinion, Dr. Sabounjian consistently noted that despite good medication adherence, Plaintiff had persistent adverse symptoms. (*See, e.g.*, AR 490 (October 2015 feelings of anxiety, tension, and hypervigilance), 491 (July 2016 increased anxiety and

20

panic, poor sleep, persistent paranoia, fear, hypervigilance, and hallucinations), 492 (October 2016 episodes of fear, anxiety, restlessness, paranoia, tension), 496 (May 2017 depression, sad, tearful affect), 498 (August 2017 feelings of isolation, tearfulness).)  During this period, Plaintiff also experienced periods of symptoms stability and improvement.  (AR 493-94.)  But the record clearly shows that Plaintiff's mental impairments manifested in fluctuating periods of severity, such that her symptoms were well-controlled at times, but poorly controlled at other times.  *Zeitler v. Berryhill*, 2017 WL 4150978, at *6 (N.D. Cal. Sept. 19, 2017).  Despite periodic improvement in response to medication, the fact that Plaintiff continued to experience adverse symptoms, often requiring changes to her medication regimen, indicates a pattern that does not support the ALJ's characterization of Plaintiff's condition as well-controlled by medications.  *See La Paz v. Colvin*, 2016 WL 4943810, at *7 n.15 (E.D. Cal. Sept. 16, 2016).  Accordingly, the ALJ's assessment is not supported by substantial record evidence and remand is appropriate for reevaluation of Dr. Kanof's opinion.

### 2.  *Dr. Berkowitz*

The ALJ credited the opinion of Dr. Berkowitz, finding it generally consistent with the medical record; but he gave Plaintiff "the benefit of doubt that she ha[d] moderate limitations related to concentration, persistence, and pace as well."  (AR 21-22.)  Plaintiff contends the ALJ erred in crediting Dr. Berkowitz's opinion because Dr. Sabounjian's progress notes "document ongoing significant symptoms of anxiety, agoraphobia, and symptoms relating to difficulty interaction appropriately with others which are consistent with and supportive of the more restrictive findings of Dr. Kanof."  (Joint Stip. at 10-11.)  The Court concludes that the ALJ did not err in this regard.  Dr. Sabounjian's records do not reveal symptoms  that were more indicative of seriously disabling mental impairment than Dr. Berkowitz's opinion.  True, Dr. Sabounjian consistently noted that Plaintiff had symptoms of anxiety, agoraphobia, and limitations in social interaction.  But Dr. Berkowitz also opined that Plaintiff had limitations in her social interaction due to a panic disorder and agoraphobia and it was reasonable for the

ALJ to conclude that the limitations Dr. Berkowitz opined were consistent with a record documenting Plaintiff's history of anxiety. The two doctors' findings do not appear inconsistent and to the extent Plaintiff disagrees with this conclusion, the ALJ is the final arbiter with respect to resolving ambiguities in the record. *See Andrews*, 53 F.2d at 1039-40. Accordingly, the ALJ's did not err in evaluating Dr. Berkowitz's opinion.

In sum, the ALJ erred in his evaluations of the opinions of Drs. Clancey and Kanof, and remand is warranted for reevaluation of those opinions. On remand, the ALJ shall not be precluded from reexamining all of the relevant opinion evidence in this case.

## II.     The ALJ's Evaluation of Plaintiff's Subjective Statements

### A. Legal Standard

An ALJ must make two findings before discounting a claimant's statements regarding the severity and persistence of her symptoms. *See Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th Cir. 2014). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quotation omitted). "Second, if the claimant has produced that evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony regarding the severity of the claimant's symptoms" and those reasons must be supported by substantial evidence in the record. *Id.*; *Carmickle v. Commissioner*, 533 F.3d 1155, 1161 (9th Cir. 2008) (providing that court must determine "whether the ALJ's adverse credibility finding . . . is supported by substantial evidence under the clear and convincing standard").

//

//

In March 2016, the Commissioner promulgated SSR 16-3p, which "makes clear what [Ninth Circuit] precedent already required:  that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms' . . . and not to delve into wide ranging scrutiny of the claimant's character and apparent truthfulness." *Trevizo*, 871 F.3d at 678 n.5.  Under SSR 16-3p, the ALJ shall determine whether to credit a claimant's statements about her pain and limitations by referring to the factors set forth in 20 C.F.R. § 404.1529(c)(3), which include:   the claimant's daily activities; the factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; the claimant's treatment, other than medication, for the symptoms; any other measure that the individual uses to relieve pain or other symptoms; and, finally, "any other factors concerning an individual's functional imitations and restrictions."  SSR 16-3p.  However, longstanding Ninth Circuit precedent prohibits the Commissioner from rejecting subjective pain statements on the sole ground that they are not fully corroborated by objective medical evidence.  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

**B.  Plaintiff's Subjective Statements**

In August 2015, Plaintiff completed an Adult Function Report.  (AR 229-35.)  She described her daily activities as waking up, feeding her dog, using the bathroom, laying down, getting up when her roommate came home, eating dinner, and going to bed.  (AR 229.)  She took care of, and played and watched movies with her grandchildren.  (*Id.*)  She also walked and cared for her dog.  (*Id.*)  Her roommate and another friend assist her with these activities.  (*Id.*)  Plaintiff used to be able to tolerate people, keep a job, and focus for longer than three minutes.  (*Id.*)  She needed reminders to bathe, to care for her hair, with personal grooming, and to take her medicine; assistance cleaning herself after using the bathroom; and someone nearby while she showered in case she lost her balance.  (AR 229-30.)  She prepared meals

for herself every other day with some assistance, as long as she was not depressed.  (AR 230.)
She cleaned and did laundry weekly with assistance and reminders.  (*Id.*)

She feared going outside alone and hyperventilated when she did so.  (AR 231.)  She
drove and shopped in stores for groceries and personal items.  (*Id.*)  She went to the store once
per month for up to two hours and occasionally got lost in the store.  (*Id.*)  She could pay bills,
count change, and use money orders, but could not handle a savings account.  (*Id.*)  Her
hobbies included watching television, crocheting, and being with her grandchildren and dog.
(AR 232.)  She could watch television and shop with other people.  (*Id.*)  She needed reminders
to go to the grocery store and to doctors' appointments, and could not go unaccompanied.  (*Id.*)
She had trouble getting along with her son and limited her social interaction in order to feel
safe.  (AR 233.)  She could only walk a few blocks without stopping, stand still for up to 20
minutes, and could not climb stairs without taking a break.  (*Id.*)  She could pay attention for
five minutes.  (*Id.*)  She could follow written instructions.  (*Id.*)  She did not have issues getting
along with authority figures.  (AR 234.)  She was once terminated from a job because she lost
her temper with a customer, and she poorly handled stress and changes in routine.  (*Id.*)  She
experienced facial twitches and sometimes talked to herself or to people who were not there.
(*Id.*)  She used a cane to ambulate.  (*Id.*)

In October 2017, Plaintiff testified at the hearing before the ALJ.  She explained that
she could not work because she got nervous around people, hyperventilated, and became "sick
to [her] stomach"; although, she could handle being around small groups  (AR 43.)  She
experienced manic episodes, during which she could not focus for days or complete tasks.
(AR 43-44.)  She also experienced frequent "extreme lows," when she could not get out of
bed all day for one to two weeks per month.  (AR 45-46.)  On these days, she was bedridden
all day (including the day before the hearing) and would either eat too much or not eat due to
anxiety.  (AR 46, 55-56, 62.)  She had good days and bad days.  (AR 46, 61-62.)  She took

various medications to treat her mental symptoms, which were "sometimes" effective, but she experienced side effects, including diarrhea.  (AR 50-52, 62-63.)

Plaintiff had a roommate who assisted her; she used to have another roommate, who moved out because she could not handle Plaintiff's mood swings.  (AR 44, 59-60.)  Plaintiff needed reminders to maintain her personal hygiene and shower.  (AR 55, 65.)  She microwaved meals to feed herself.  (*Id.*)  On good days, she brushed her teeth, fed and walked her dog a quarter of a block, straightened piles in her room, watched television, napped, microwaved food, and read.  (AR 56-58.)  She generally did not require assistance managing her finances, but sometimes she needed a reminder to pay her phone bill.  (AR 65.)  She spent time with her grandchildren at home while accompanied by another person, and she did not take them elsewhere.  (AR 60-61.)  She had trouble getting along with her son.  (AR 66.)  She had trouble following instructions, and simple instructions had to be read to her.  (*Id.*)  She once lost a job because she lost her temper with a customer; additionally, she did not socialize well and became irritable.  (AR 67-68.)

As to her physical limitations, she could not stand for a long time (more than 30 minutes) or walk long distances (more than a half a block).  (AR 46-47, 52-53.)  She walked at the grocery store aided by a cart, but did not go to large stores because there were too many people.  (AR 53, 64-65.)  She experienced pain in her feet, which she described as "stabbing," and ranked an 8 out of 10 as to its severity, going up to 10 if she stood for a long time.  (AR 47.)  She used a cane to keep balance and often had balance issues due to foot problems.  (AR 48, 69-70.)  She experienced difficulty bending, stooping, and squatting, but could tie her shoes, reach under a cabinet, open doors, and open jars.  (AR 53-54.)  She went to doctors every three months.  (AR 49.)  She used an inhaler for asthma, along with a CPAP machine while she slept.  (AR 51-52, 70.)  She could lift a 10 pound bag, but had trouble with heavier items.  (AR 54.)  She had no limitations sitting.  (*Id.*)  She had problems ascending and descending stairs and became short of breath when she climbed stairs.  (AR 70-71.)

25

1

2

### C. The ALJ's Assessment of Plaintiff's Subjective Statements

3

Applying the two-step procedure, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (AR 19.) The ALJ then found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the alleged symptoms were not entirely consistent with the medical evidence and other record evidence, reasoning as follows. (*Id.*) First, Dr. Afra's findings concerning Plaintiff's physical impairments did not support the degree of limitation she alleged or suggest the presence of any impairment more limiting than discussed by the ALJ. (AR 20.) Additionally, Plaintiff's allegation that she was bedridden for half of each month was not substantiated by any record evidence. (*Id.*) Second, the record showed that Plaintiff's symptoms were mostly controlled with medication compliance. (AR 20-21.) Third, Plaintiff's daily activities were not limited to the extent one with expect considering Plaintiff's subjective complaints of disabling symptoms. (AR 21.)

15

16

### D. Analysis

17

18

Plaintiff argues that the ALJ failed to provide specific, clear, and convincing reasons supported by substantial evidence for rejecting Plaintiff's subjective statements. Specifically, the ALJ was not permitted to discount her statements about being bedridden solely based on those statements' lack of substantiation by the objective medical evidence; he failed to articulate how Plaintiff's daily activities translated to her ability to perform basic work activities; and his conclusion that Plaintiff's symptoms were well-controlled with medication is inconsistent with Dr. Sabounjian's records documenting persistent symptoms despite medication adherence. (Joint Stip. at 26-27, 32-33.)

26

27

Plaintiff's first two arguments are meritless. Plaintiff is correct that in evaluating a claimant's credibility "after a claimant produces objective medical evidence of an underlying

26

impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity" of the alleged symptoms. *Burch*, 400 F.3d at 680; *Rollins*, 261 F.3d at 857; *see* 20 C.F.R. § 1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."). Here though, the ALJ did not reject Plaintiff's testimony *only* because her statements were not substantiated by objective evidence. He also rejected Plaintiff's subjective statements (including the statements about being bedridden) as inconsistent with Plaintiff's activities of daily living. (AR 21.) These are specific and legitimate reasons for discrediting a claimant's subjective statements. *See* 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms."); *Rollins*, 261 F.3d at 857 ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."); *Reddick*, 157 F.3d at 722 (holding that daily activities inconsistent with claimant's self-described level of pain is a valid reason for an adverse credibility finding).

The ALJ's conclusion that Plaintiff's statements about being bedridden are inconsistent with objective evidence is also supported by substantial evidence. The record contains no objective evidence supporting the inference that Plaintiff's condition necessitated or resulted in confinement to her bed for any duration, much less the duration to which she testified. The ALJ's conclusion that Plaintiff's activities of daily living were inconsistent with statements about her symptoms is also supported by substantial evidence. Plaintiff's daily activities bear on her credibility if the level of activity is inconsistent with her claimed limitations. *See Reddick*, 157 F.3d at 722. Thus, an ALJ may rely on a plaintiff's daily activities to support an adverse credibility determination only when those activities either "contradict [the plaintiff's] other testimony," or "meet the threshold for transferable work skills"; *i.e.*, where she "is able

to spend a substantial part of . . . her day performing household chores or other activities that are transferable to a work setting."  *Orn*, 495 F.3d at 639; *Smolen v. Chater*, 80 F.3d 1273, 1284 n. 7 (9th Cir. 1996).  However, a claimant need not be "utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."  *Id.*; *see Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability."  *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

Contrary to Plaintiff's contention, the ALJ need not articulate how Plaintiff's activities of daily living are transferable to a work setting so long as those activities contradict Plaintiff's other testimony.  *Orn*, 495 F.3d at 639.  Here, the ALJ specified which of Plaintiff's daily activities were inconsistent with the degree of limitation she alleged; specifically, Plaintiff described to Dr. Kanof that she could dress and bathe herself, take care of her dog, do her own shopping and cooking, pay her own bills, socialize with two roommates, and spend time with her grandchildren.  (AR 21 (citing AR 471).)  The ALJ also noted that Plaintiff had attended college through 2013, which undermined her allegations of anxiety around others and difficulties concentrating.  (*Id.* (citing AR 334-50).)  The ALJ properly identified these activities as inconsistent with Plaintiff's assertions about the severity of her limitations.  Plaintiff also regularly went to doctors' appointments, shopped for groceries, and took her dog outside several times a day—all activities that are inconsistent with her statements about being bedridden.  In addition, her daily activities are inconsistent with statements about her inability to focus.  Although Plaintiff stated that she could not focus for long time and had trouble completing tasks (*see, e.g.*, AR 43-44, 229), she testified that she periodically went into the community to shop for groceries and personal items, activities that require a greater degree of focus than what she has alleged.  In order to effectively shop for groceries, Plaintiff must have the ability to identify what items she needs, go to a store, remember the items she needed,

1   locate them among hundreds of other products, purchase them using currency or electronic

2   payment means and bring them home.  Accordingly, the ALJ properly determined that, to the

3   extent Plaintiff alleged that she experienced disabling symptoms, her self-reported activities

4   of daily living render her allegations less than fully credible.[7]

5

6   As to Plaintiff's third argument, the Court agrees that the final reason provided by the

7   ALJ for discounting Plaintiff's testimony—that her condition was adequately controlled with

8   medication—is not supported by substantial evidence.  As discussed *supra*, Dr. Sabounjian's

9   notes reveal that Plaintiff experienced persistent adverse symptoms despite good adherence to

10   her medication regimen.  (*See, e.g.*, AR 490-92, 496, 498.)  However, because the ALJ

11   provided additional legitimate reasons for his adverse credibility determination, remand for

12   reconsideration of Plaintiff's subjective statements is not warranted.

13

14   **III.   The ALJ's Evaluation of Lay Witness Statements**

15

16   **A.  Legal Standard**

17

18   "In determining whether a claimant is disabled, an ALJ must consider lay witness

19   testimony concerning a claimant's ability to work."  *Stout*, 454 F.3d at 1053.  Indeed, an ALJ

20   is "required to consider and comment upon competent lay testimony, as it concern[s] how [a

21   claimant's] impairments impact his ability to work."  *Bruce v. Astrue*, 557 F.3d 1113, 1115-

22   16 (9th Cir. 2009).  Such testimony "cannot be disregarded without comment."  *Nguyen v.

23   Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis omitted); *see also Taylor v. Comm'r

24   of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011) (recognizing that an ALJ must

25   "provide specific, germane reasons for discounting lay witness testimony").

26

27   ---

[7]   Even if the ALJ erred by discounting Plaintiff's statements about her ability to focus and concentrate based on
those statements' inconsistency with Plaintiff's activities of daily living, any such error is harmless because, in his RFC

28   assessment, the ALJ gave Plaintiff "the benefit of doubt that she has moderate limitations related to concentration,
persistence, and pace as well."  (AR 21-22.)

1
2

### B.  The Lay Witness Statement

3
4
5

In October 2015, Victoria Elmer, Plaintiff's roommate of 10 years completed a Third Party Function report in connection with Plaintiff's SSI application, stating as follows.  (AR 238-45.)  Plaintiff could not go outside by herself, be in large crowds, or walk far distances on her own.  (AR 238.)  Her daily activities included waking up, using the restroom, getting dressed, resting until someone came home, having dinner, and going to bed.  (AR 239.)  She played with, watched television and movies with, and bathed her grandchildren.  (*Id.*)  She took her dog to the restroom with her, fed him, and gave him water; she received assistance from Elmer and another friend with taking the dog outside, grooming, and bathing him.  (*Id.*)  Before Plaintiff's illnesses, she was able to walk in large groups of people without anxiety, and she had a job.  (*Id.*)  She had trouble breathing while she slept and needed to use a CPAP machine for assistance.  (*Id.*)

6
7
8
9
10
11
12
13
14
15

Elmer testified that Plaintiff required assistance keeping balance while bathing, and cleaning herself after using the restroom.  (*Id.*)  She needed reminders to take care of her grooming and personal needs, and to take her medicine.  (AR 240.)  She prepared her own meals every other day.  (*Id.*)  She cleaned and did laundry, each of which took a few hours, and needed encouragement to do those chores.  (*Id.*)  She went outside almost every day with her dog.  (AR 241.)  She could not go outside alone because she had anxiety attacks around other people and crowds.  (*Id.*)  She could drive and shop in stores for groceries and household products on a monthly basis, but needed a reminder to go grocery shopping.  (AR 241-42.)  In general, she could manage her finances, but she could not handle a savings account.  (AR 241.)

16
17
18
19
20
21
22
23
24
25

Plaintiff enjoyed watching television and movies, crocheting, and spending time with her dog and grandchildren.  (AR 242.)  She had trouble getting along with her son, and could not handle crowds or new people without feeling anxiety.  (AR 243.)  She could not stand for more than 20 minutes or walk for a few blocks before resting.  (*Id.*)  She needed reminders to

26
27
28

complete tasks and was told things multiple times; she could pay attention for 5 to 10 minutes. (*Id.*)  She could finish tasks, but could not follow written instructions very well, and needed reminders relating to oral instructions.  (*Id.*)  She got along "fine" with authority figures.  (AR 244.)  She had lost her temper with a customer at her prior job.  (*Id.*)  She could not handle stress or changes in routine.  (*Id.*)  She sometimes experienced facial and body twitches, and talked to herself or someone who was not there.  (*Id.*)  She used a cane to ambulate.  (*Id.*)

## C. The ALJ's Decision

The ALJ stated that he considered Elmer's statements, including the nature and extent of the relationship, whether the statement was consistent with other evidence, and other factors that tended to support or refute the evidence.  (AR 22.)  He noted that while Elmer was not an acceptable medical source, he still considered her statement to help determine the severity of Plaintiff's impairments and their effects on Plaintiff's abilities.  (*Id.*)  He gave Elmer's statement little weight and found it unpersuasive because it was a lay opinion based on casual observation, rather than objective medical evidence; and it was potentially influenced by loyalties of friendship, and was not outweighed by the accumulated medical evidence regarding the extent to which Plaintiff's impairments limit her functional ability.  (*Id.*)

## D. Analysis

Plaintiff contends that the ALJ failed to consider or provide reasons germane to Elmer for discounting her statements.  (Joint Stip. at 33-34.)  The Court disagrees.  At the very least, the ALJ's discussion makes clear that he did consider Elmer's statements.  (AR 22.) Additionally, he provided at least one reason germane to her for doubting her credibility.  *See Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993) (holding that an ALJ must consider lay witness testimony, but may discount that testimony by providing "reasons that are germane to each witness").  The first reason the ALJ provided for discounting Elmer's statement is not

germane to her, as every lay witness statement is, by definition, a lay opinion based on casual observation rather than medical evidence.  However, the second reason provided by the ALJ is germane to Elmer.  An ALJ may discount lay witness statements where the witness and the claimant had a "close relationship" such that the witness "was possibly influenced by her desire to help" the claimant.  *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).  Here, it is undisputed that Plaintiff and Elmer were roommates for ten years, they had a close relationship, and Elmer assisted Plaintiff with her daily activities.  Thus, it is entirely plausible that Elmer's statements may have been influenced by her desire to help Plaintiff.

Because the Court finds that the ALJ provided at least one reason germane to Elmer for discounting her lay witness opinion, the Court need not determine whether the final reason provided by the ALJ for discounting that opinion, *i.e.*, the fact that it was not outweighed by the accumulated medical evidence about Plaintiff's functional ability, is also germane to her. Remand for reevaluation of Elmer's statements is not warranted.

## IV.    The ALJ's RFC Assessment (and Consideration of Plaintiff's Obesity)

A claimant's RFC represents the most a claimant can do despite his or her limitations. 20 C.F.R. § 416.945(a)(1); *Reddick*, 157 F.3d at 724; *Smolen*, 80 F.3d at 1291.  The ALJ's RFC determination "must set out *all* the limitations and restrictions of the particular claimant." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (emphasis in original).  The ALJ is responsible for determining credibility and resolving conflicts in medical testimony.  *Reddick*, 157 F.3d at 722.  An ALJ can satisfy the specific and legitimate reasons standard by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretations thereof, and making findings."  *Orn*, 495 F.3d at 632; *see* 20 C.F.R. § 416.945(a)(3) (stating that Commissioner will assess RFC "based on all of the relevant medical and other evidence").  In evaluating the impact of obesity on a claimant's RFC, the ALJ's assessment "must consider an individual's maximum remaining ability to do

32

sustained work activities in an ordinary work setting on a regular and continuing basis." *Burch*, 400 F.3d at 683.  As with other impairments, the ALJ should explain how he determined whether obesity caused any physical or mental impairments. *See* SSR 02-1p, 2002 WL 34686281 (S.S.A. 2002).

Plaintiff argues that the ALJ erred in formulating an RFC that was not supported by the record as a whole for two reasons.  First, Plaintiff reiterates that the ALJ erred in his evaluation of most of the opinion evidence.  (Joint Stip. at 36, 38, 40-41.)  For the reasons described in section I, *supra*, the ALJ did not err in evaluating most of the opinion evidence, with the exception of the opinions of Drs. Kanof and Clancey.  Accordingly, as discussed above, remand for reconsideration of those opinions is warranted.

Plaintiff's second argument is that the ALJ erred by failing to consider the combined effect of Plaintiff's impairments, including her obesity, in formulating the RFC assessment. (*Id.* at 36-39.)  Here, the Court agrees that the ALJ erred by failing to discuss the impact of Plaintiff's obesity in the RFC assessment.  At the hearing, Plaintiff testified that she was obese and her attorney confirmed that her physical impairments were exacerbated by her weight. (AR 32-33, 38.)  Plaintiff's obesity is also well-documented in the record.  (*See, e.g.*, AR 88, 101, 206 (noting she was 5'3" and 310 pounds); 292-93, 296, 299, 302, 304, 306, 311, 314, 320, 354, 359, 363, 369, 372, 379, 381, 384 (noting she was morbidly obese with BMI between 50 and 59.9); 308, 374, 379, 413, 425, 444 (noting she was between 278 and 290 pounds); 479 (noting that Plaintiff was 5'2.5" and 305 pounds, with a BMI of 35.8).)

The ALJ found obesity to be a severe impairment and noted that "the combined effects of obesity with another impairment, particularly a musculoskeletal, cardiac, or respiratory impairment, can be greater than the effects of each of the impairments considered separately (SSR 02-01p).  [Plaintiff's] obesity therefore is considered in conjunction with the other severe impairments."  (AR 17.)  The ALJ also noted that some of Plaintiff's doctors found that she

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

was obese.  (*See* AR 19.)  However, those statements are not accompanied by meaningful analysis.  The ALJ does not explain how Plaintiff's obesity impacts her other impairments or why he does not factor Plaintiff's obesity in her RFC assessment.[8]  *See Celaya v. Halter*, 332 F.3d 1177, 1182 (9th Cir. 2003) (holding that the ALJ erred in not considering obesity in sequential analysis when obesity "was a condition that could exacerbate her reported illness"); *Ramirez v. Berryhill*, Case No. SACV 17-417-KS, 2018 WL 2392155, at *11 (C.D. Cal. May 25, 2018); *see also* SSR 02-1p.

Given the well-established correlation between obesity and diabetes and asthma (from which Plaintiff suffers), "the ALJ's failure to address obesity as a severe impairment in combination with Plaintiff's other impairments is legal error that is not harmless."  *Ramirez*, 2018 WL 2392155, at *11.  Accordingly, remand is warranted on this issue.  The Court's determination that the ALJ erred is not a finding that the ALJ must necessarily so find on remand, only that the ALJ  must evaluate the record more closely with respect to Plaintiff's obesity and if the ALJ elects to disregard obesity in the sequential evaluation, must articulate legally sufficient reasons supported by substantial evidence for doing so.  *See id.*

## V.    Remand For Further Administrative Proceedings Is Warranted

In light of the foregoing, the Court finds that ALJ erred in his:  (1) evaluation of the opinions of Drs. Kanof and Clancey; and (2) failure to properly consider the impact of Plaintiff's obesity on the RFC assessment.  The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. *Harman v. Apfel*, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  A district court may remand for an

---

[8]    The Court notes that the ALJ's failure cannot be explained by the fact that the record does not support the conclusion that no doctor placed limitations on Plaintiff solely due to her obesity, because Dr. Clancey limited Plaintiff to sedentary work due to her obesity.  (AR 111.)  But even if the ALJ's failure can be explained *ex post* by the fact that there is no record evidence that any doctor placed limitations or restrictions on Plaintiff's activities based solely on her obesity, this is insufficient.  *See Ramirez*, 2018 WL 2392155, at *11.  The Court may only review the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely."  *Orn*, F.3d at 630.

award of benefits when the following three conditions are satisfied:  "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand."  *Garrison*, 759 F.3d at 1020.  The third of these conditions "incorporates . . . a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made."  *Id.* at 1020, n.26.  However, even if those three requirements are met, the Court retains "flexibility" to determine the appropriate remedy and may remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (quoting *Garrison*, 759 F.3d at 1021).

Here, the Court cannot say that further administrative proceedings would serve no useful purpose and, if the improperly discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled on remand.  *See Garrison*, 759 F.3d at 1020.  This case, then, is not the "rare exception" in which the credit as true rule should be applied and the matter remanded for the calculation and award of benefits.  *See Leon v. Berryhill*, 880 F.3d 1141, 1145 (9th Cir. 2017).   Therefore, the Court remands for further administrative proceedings consistent with this Order.  Upon remand, the ALJ is not precluded from reassessing any evidence.

## CONCLUSION

Accordingly, for the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED AND REMANDED for further administrative proceedings consistent with this Memorandum Opinion and Order.

*//*

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for Plaintiff and counsel for Defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATE: May 18, 2020

_____
KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE

36